**UNITED STATES**

**v.**

**SFERAS (two cases).**

**UNITED STATES v. SKALLY et al.**

**Nos. 10799–10800–10801.**

United States Court of Appeals
Seventh Circuit.

Jan. 14, 1954.

Writ of Certiorari Denied

April 5, 1954.

See 74 S.Ct. 630.

'. Warren Krinsky, Charles D. Snewind, Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Attorney, John D. Schwartz, Daniel P. Ward, Richard G. Kahn, Asst. U. S. Attys., U. S. Court House, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and FINNEGAN, Circuit Judges.

DUFFY, Circuit Judge.

In an indictment consisting of 14 counts, defendants were charged with the violation of Title 18, U.S.C.A. §§ 471, 472, and 473, pertaining to counterfeiting. In Counts 1 to 7 inclusive, defendants William Skally and William Russo were charged with possession and sale of certain counterfeited $10 and $20 Federal Reserve Notes; in Counts 8 to 13 inclusive, defendants James Sferas and Sam Sferas were charged with making, possession, and sale of the same counterfeited Federal Reserve Notes described in Counts 1 to 7; and Count 14 charged conspiracy by all defendants. The trial was to a jury which found all defendants guilty as charged.

In addition to claiming that the evidence is insufficient to support the guilty verdict as to Counts 1 to 7 inclusive and Count 14, defendant Skally strongly relies upon the defense of entrapment. Defendant Russo also raises the defense of insufficiency of the evidence as to him, and in addition alleges prejudicial error in the admission into evidence of a document relating to the forfeiture of his automobile. James and Sam Sferas are brothers who operated a commercial printing business in Chicago for 13 years. They insist that the evidence upon which Sam Sferas was convicted is not sufficient as a matter of law to substantiate the charges against him. Both Sam and James Sferas insist that the search of the premises occupied by them as a printing establishment was unreasonable and the seizure of evidence therein illegal, and in violation of these defendants' rights under the Fourth and Fifth Amendments to the United States Constitution.

We have read the voluminous record, consisting of 859 printed pages, and considering the evidence in the light most favorable to the government, there is clearly substantial proof to support

the jury's verdict of guilty as to defendants Skally, Russo and James Sferas. We shall discuss later the proposition as to whether the evidence is sufficient to support the verdict of guilty as to Sam Sferas. Hence, the judgment of conviction must stand as against Skally unless he can successfully invoke the defense of entrapment, as against Russo unless there was prejudicial error in the admission of evidence against him, and as against James Sferas unless there was an unreasonable search and seizure of the premises where the printing shop was located. This defendant also raises a question as to a member of the jury.

### William Skally.

We consider first defendant Skally's claim that he was entrapped by the informer, John Drake. In passing, we have noted the bitter attack made on Drake, including that he had a previous police record. However, all this was brought out before the jury, which had an opportunity to observe him on the witness stand. The jury was the sole judge of his credibility. In considering the evidence in the light most favorable to the government, we must assume that where Skally's testimony conflicted with that of Drake, the jury believed Drake as he narrated his dealings with Skally.

Skally did not raise the defense of entrapment at the trial. Ordinarily the defense of entrapment raises a question of fact which should be submitted to the jury under proper instructions. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; United States v. Markham, 7 Cir., 191 F.2d 936, 937. Of course that was not done in the case at bar, because the matter was not brought to the attention of the trial judge. No reason is suggested why Skally did not raise the defense of entrapment during the trial. Perhaps such failure is understandable as a matter of strategy. When testifying in his own behalf, Skally denied he had anything to do with the handling, possession, or sale of the counterfeited notes. Obviously such testimony is contradictory to his present position that he was tricked and entrapped by the informer into violating the laws against counterfeiting.

In an attempt to promote the orderly administration of justice, appellate courts will not, generally speaking, pass upon defenses which have not been previously brought to the attention of the trial court. United States v. Jones, 7 Cir., 204 F.2d 745, 749. It is recognized that under Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., plain errors and defects affecting substantial rights may be noticed by the appellate court although not brought to the attention of the trial court. The application of Rule 52(b) rests in a large measure upon the exercise of sound judicial discretion. United States v. Jones, supra, 7 Cir., 204 F.2d at page 748; United States v. Jonikas, 7 Cir., 187 F.2d 240. This court has stated, "Such errors must, however, be substantial and capable of resulting in miscarriage of justice to warrant the reversal of a judgment of conviction based on ample evidence." United States v. Raub, 7 Cir., 177 F.2d 312, 315.

The evidence in this case against Skally is so ample to sustain the judgment of conviction as to him that we are warranted in refusing to pass upon the newly raised defense of entrapment. We have previously refused to do so in many cases, such as United States v. Ginsburg, 7 Cir., 96 F.2d 882, 885, certiorari denied 305 U.S. 620, 59 S.Ct. 81, 83 L.Ed. 396, and United States v. Kaiser, 7 Cir., 138 F.2d 219, 220, certiorari denied 320 U.S. 801, 64 S.Ct. 431, 88 L.Ed. 483. Appropriate to the situation at bar is our statement in United States v. Jones, supra, 204 F.2d at page 749: "We shall not, in a flagrant case, give cognizance to a complaint first made to us and thus give defendant two bites at the same cherry, by declaring erroneous action of the trial court, the fault of which defendant did not see fit to make the court aware, when he had the opportunity to do so."

### William Russo.

The evidence disclosed that Russo and Skally were friends. During the period when Skally and Drake were having various meetings with reference to the counterfeited notes, Russo and Skally were observed together several times, and on one occasion Russo, Skally and James Sferas were seen conversing in Malizia's Tavern, a place where Skally and Drake had met a number of times. On December 18, 1951, a date when Drake received the first delivery of $50,000 in counterfeited notes, Russo and Skally were observed at Bill's Place. A few moments later Russo came out, walked to his Cadillac automobile, and removed therefrom a package about the size and shape of a shoe box, and then re-entered Malizia's with it. Agent Drake testified that when he, at Skally's direction, picked up from a radiator near the doorway of Malizia's a box of the same size and appearance as Russo had brought in, he observed that Russo was standing nearby, watching him. It was established that that box contained $50,000 in counterfeited currency.

On the evening of February 2, 1952, Skally drove Drake on various streets in Chicago. By pre-arrangement, when a Cadillac automobile driven by Russo pulled alongside, Drake transferred to the Cadillac. Russo told Drake that when he sounded the horn to roll down the window of the Cadillac, and that a package would be handed to him. After driving around the block several times, the horn was sounded, Drake opened the door, and an unknown person handed to Drake a package which, it was later proved, contained $50,000 in counterfeited currency. Russo asked Drake when they would be paid for this currency, but Drake would not discuss that point with him.

In the early hours of February 3, 1952, Russo left his Cadillac car parked near Malizia's. For some hours the government officers kept it under surveillance, and then seized it. Russo did not return to his residence that morning, but stayed at the home of a sister for some five or six days, at which time he surrendered to the Secret Service officers. Russo made inquiry about administrative proceedings for recovering his automobile. He was given a form to sign directed to the Secretary of the Treasury, in which it was stated, "Assent is hereby given to the forfeiture for violation of the Customs Revenue Laws of 1942 Cadillac sedanette * * * now in the custody of the Collector of Customs at the port of Chicago, Ill. * *; and I hereby waive any further rights or proceedings in the premises, and make claim for the release and delivery of said property upon the deposit by me with the said Collector of Customs of $300.00, being the appraised domestic value of said property." He was also given a form to sign which had been filled out by customs officials and about the center of said form, under the description of the automobile appeared, "Received the within described automobile 3/17/52," and Russo signed immediately under said line. Further down on the form someone had typed in the following: "This automobile was seized on Feb. 4, 1952, by Special Agents of the Secret Service, after being abandoned by the owner, for the transportation therein of counterfeit $10 and $20 Federal Reserve Notes." Russo testified that he did not read the receipt before he signed same. At the trial this document, Exhibit 10–B, over objection, was received in evidence as an admission against interest by William Russo.

Considering the form of the document and the unobtrusive manner in which the typed statement was inserted in the form, and the circumstances under which Russo signed same, we think Exhibit 10–B should not have been received in evidence. In a close case the receipt of such evidence might be prejudicial. For that reason we have set out in some detail other evidence strongly linking Russo with the possession and sale of counterfeited currency. We think the conviction is sure, that the error did not influence the jury, or at worst had but

a very slight effect, and that conviction would have resulted in any event. Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557. It is apparent that its receipt in evidence did not cause a miscarriage of justice. United States v. Henderson, 7 Cir., 185 F.2d 189, 193. Under the circumstances of this case we hold that the receipt of Exhibit 10–B was not prejudicial error.

### James Sferas.

 We shall not detail the evidence connecting defendant James Sferas with the making, possession and sale of the counterfeited notes. As heretofore indicated, the record clearly sustains the verdict and judgment of guilty, unless the search of the printing company premises was unreasonable and there was an illegal seizure of items thereafter introduced into evidence, or unless his contention is sustained that the jury was not impartial.

On February 3, 1952, a Sunday, Secret Service agents went to the printing plant operated by Sam and James Sferas, and were admitted by James Sferas who appeared in his underclothes, explaining that he had been receiving a rubdown. After asking the agents to wait, he dressed and the agents then placed him under arrest for counterfeiting. James Sferas stated, "It is a bum steer. Somebody is giving you fellows a bum rap on me. You can look this place all over and you won't find anything here. * * * There is nothing in the place you can find that will show I did anything wrong. Go ahead and look the place over. You are welcome to search." One agent then stated, "That is what we intend to do. Do you have any objection if we make a complete and thorough search?" And James Sferas said, "No, I want you to. I have not done anything wrong." The agents then collected a few blobs of ink, certain specimens of paper, and some gummed tape.

On February 4, while James Sferas was still in custody, a Secret Service agent asked him if he would object to the agents returning to the printing plant for another search, to which Sferas replied that he had nothing to hide and had no objection. Three large knives which had been used in paper-cutting machines at the Sferas plant were removed by the agents. That afternoon the knives were returned to the shop and some tests were made using one knife, identified at the trial as Exhibit 11. James Sferas, who apparently accompanied the agents to the plant, assisted one of his employees in mounting this knife in the machine so that the tests could be made.

The reason for the tests was that an agent had noted that on the sides of the stacks of counterfeited money whatever knife was used in cutting the paper had made clearly discernible marks and striations. And an examination of the sides of the stacks of so-called "Five Bucks" coupons, admittedly cut and printed at the Sferas printing plant, had identical markings. When many layers of paper were cut in the test, using knife, Exhibit 11, the same tell-tale marks and striations again were evident. It was thus established beyond argument that the paper used in printing the counterfeited currency had been cut with knife, Exhibit 11, which was part of the regular equipment of the Sferas printing shop.

It is admitted that when the agents went to the printing plant on February 3, they had neither warrants for the arrest of James or Sam Sferas nor a search warrant; also that when they took the knives from the plant on February 4, they did not have a search warrant. The government, relying on such cases as United States v. Jones, 7 Cir., 204 F.2d 745, 748, 751; Landsborough v. United States, 6 Cir., 168 F.2d 486, 488; and Cromer v. United States, 78 U.S.App.D.C. 400, 142 F.2d 697, 699, makes two points: (1) defendants, having failed to move at the trial to suppress the evidence, may not now raise the question of illegal search and seizure on appeal, (2) had the question been raised in the trial court, the evidence conclusively shows, and the trial court

would have found, James Sferas and Sam Sferas consented to the search. Defendants, citing among other cases, Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; and Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L. Ed. 145, urge that the testimony of the government witnesses themselves established the unconstitutionality of the search and seizure, and that under such circumstances the appellate court may consider the question, in face of the fact that it was not raised in the trial court by a motion to suppress.

The Supreme Court discussed the proper application of the three last named cases in Segurola v. United States, 275 U.S. 106, 111, 48 S.Ct. 77, 79, 72 L.Ed. 186, where the court stated, "This principle is that, except where there has been no opportunity to present the matter in advance of trial, Gouled v. United States, 255 U.S. 298, 305, 41 S.Ct. 261, 65 L.Ed. 647; Amos v. United States, 255 U.S. 313, 316, 41 S.Ct. 266, 65 L.Ed. 654; Agnello v. United States, 269 U.S. 20, 34, 46 S.Ct. 4, 70 L.Ed. 145, a court, when engaged in trying a criminal case, will not take notice of the manner in which witnesses have possessed themselves of papers or other articles of personal property, which are material and properly offered in evidence, because the court will not in trying a criminal cause permit a collateral issue to be raised as to the source of competent evidence. To pursue it would be to halt in the orderly progress of a cause and consider incidentally a question which has happened to cross the path of such litigation and which is wholly independent of it."

Rule 41(e), Federal Rules of Criminal Procedure, provides that a motion to suppress evidence claimed to be seized as the result of an unreasonable search must be made before trial unless there was no previous opportunity to make such motion or the defendant was not aware of the grounds on which the motion was based. Here no motion to suppress was made before or at the trial, even though there was a period of ten months in which such a motion might have been made, and also James and Sam Sferas were fully aware of the items which had been seized by the Secret Service agents. Only a mild objection was made at the trial to the introduction of the ledger book kept by the partnership on the ground that it was taken from the Sferas plant without a warrant. Counsel for the Sferas defendants was fully advised of the situation for, in a colloquy, the trial court said to him, "But you have never made any motion to suppress the evidence, nor have you made any motion of any kind indicating an illegal search of any kind or nature, or description, was had in this case."

Earlier in this opinion, in discussing the defense of entrapment, we pointed out that an orderly administration of justice demands that certain kinds of alleged errors should be first presented to the trial court; otherwise the appellate court would be fully justified in not considering such questions on appeal. The defense of unreasonable search and seizure is in that category. In the case at bar, had this defense been properly raised by a motion to suppress, it is almost certain that the trial court would have made a finding that at the time of his arrest and also on the following day, James Sferas voluntarily consented to the search that was made. We hold that the record clearly discloses that such consent was given, thus obviating the necessity for a search warrant. Further, we think the consent given by James Sferas was binding upon his brother Sam. We have been unable to find any authority on this point involving a partnership, but the rule seems to be well established that where two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either. Driskill v. United States, 9 Cir., 281 F. 146; Stein v. United States, 9 Cir., 166 F.2d 851; State v. Cairo, 74

R.I. 377, 60 A.2d 841; McGinnis v. Commonwealth, 208 Ky. 239, 270 S.W. 832; 31 A.L.R. 2d, p. 1086. The defense of unreasonable search and seizure raised by defendants James and Sam Sferas must be and is overruled.

Defendants James and Sam Sferas also assert error because the trial court, during the course of the trial, denied defendants' motion to withdraw Juror Fred Tabbert. The basis of the motion was that the government presented one Frank Zene as a witness to testify as an expert as to paper-cutting knives. Zene was a binder-foreman in a company in which Juror Tabbert was employed. Zene testified to the rather self-evident fact that paper-cutting knives become burred and chipped from use. He further testified that initial burrs will remain in the knife even though others may develop from further use.

The qualifications of a juror within the statutory limits rest in the sound discretion of the trial court, and its rulings should not be interfered with on appeal except on a clear showing of abuse. We find no abuse of discretion in the trial court permitting Mr. Tabbert to continue as a juror in this case. Bratcher v. United States, 4 Cir., 149 F.2d 742, 746; Kelly v. Gulf Oil Corp., D.C., 28 F.Supp. 205, affirmed, 3 Cir., 105 F.2d 1018.

### Sam Sferas.

Whether there is sufficient evidence to sustain the verdict and judgment of conviction against Sam Sferas presents a much closer question than in the case of the other defendants. Sam Sferas had no previous police record. Further, for a period from November 26, 1951, to February 2, 1952, Secret Service agents, directly and through Drake, the informer, had been conducting negotiations for the purchase of counterfeited money. Nowhere in the conversations and transactions testified about was Sam Sferas so much as mentioned. Although the fingerprints of James Sferas were found on the counterfeited money and on the paper wrappers, there was no such evidence against Sam Sferas. In Count 14, the conspiracy count, 48 overt acts were listed. Sam Sferas was mentioned in only four of these, and in each he is charged with a crime. Two of the overt acts charge him with counterfeiting the notes, and the other two charge that he delivered the counterfeited notes to Skally and Russo. Hence the government was required to prove participation in the conspiracy by proving that Sam Sferas manufactured the notes, had them in his possession, or passed them to Skally and Russo. The government did not produce any evidence to make such proof except the testimony of a handwriting expert.

Proof was made that when the counterfeited notes were delivered on December 18, 1951, and on February 2, 1952, they were wrapped in brown paper. On the wrapper of the December 18 delivery, there was written in pencil "20—G11684088A" and "10—G28563185A." These numbers and letters corresponded with the serial numbers on the $20 and $10 counterfeited notes respectively contained in that wrapper. There likewise appeared on the wrapper of the February 2 delivery, written in pencil, "20—G11684088A" and "10—G28563176A." These numbers and letters corresponded with the serial numbers of the $20 and $10 counterfeited notes respectively contained in that wrapper. (Thus it will be noted that the $20 counterfeited notes in both deliveries bore the same serial number.)

The government offered the testimony of Post Office Inspector Kelly as a handwriting expert. This inspector had had some ten years experience in this field, and was assigned to the examination of questioned documents. The attorney for Sferas stated to the court that he admitted the qualifications of this witness. Mr. Kelly had made comparisons with admittedly genuine specimens of the handwriting of Sam Sferas, and gave his opinion that the writing on the wrappers

of the December 18 and February 2 deliveries of counterfeited notes was the handwriting of Sam Sferas. During the course of the trial Sam Sferas, in the presence of the jury, wrote out the same letters and numbers appearing on the wrappers, and, after an examination of same and a comparison with the letters and numbers written on the wrappers in evidence, Mr. Kelly testified that the specimen writings given by Sam Sferas in court showed they were written by the same person who wrote the numbers on the wrappers which contained the counterfeited notes. Inspector Kelly not only stated his unqualified opinion, but presented his reasons therefor. He demonstrated to the jury, by means of enlarged photographs, the many striking similarities between the writing on the wrappers and the admitted genuine writings of Sam Sferas. At the trial Sam Sferas testified that the handwriting on the wrappers was not his.

Of course opinion evidence of all kinds should be carefully scrutinized. However, as in the case of testimony on other subjects, the weight of the testimony of experts in handwriting is a matter for the determination of a jury. United States v. Licht, 2 Cir., 158 F.2d 458, 460, certiorari denied 330 U.S. 824, 67 S.Ct. 863, 91 L.Ed. 1274; Lemmons v. United States, 10 Cir., 62 F.2d 608, 611; Clark v. United States, 5 Cir., 293 F. 301, 305. The jury was entitled to believe from Inspector Kelly's testimony that Sam Sferas wrote on the wrappers containing the counterfeited Federal Reserve Notes the letters and numbers corresponding to the serial numbers of the counterfeited notes enclosed therein. The jury was thus entitled to infer that Sam Sferas at least conspired to commit the crimes as charged in Count 14. The sentences imposed by the court on all of the counts was less than the maximum amount that could have been imposed on the conspiracy count alone. We conclude that there is substantial evidence to sustain the verdict of conviction against defendant Sam Sferas.

The judgments of conviction against defendants William Skally, William Russo, James Sferas and Sam Sferas are affirmed.