[Civ. No. 24189. Second Dist., Div. Three. July 21, 1960.]

BONADIMAN-McCAIN, INC. (a Corporation) et al., Respondents, v. HAROLD L. SNOW et al., Appellants.

Parker, Stanbury, Reese & McGee and Raymond G. Stanbury for Appellants.

Belcher, Henzie & Fargo and Stevens Fargo for Respondents.

VALLÉE, J.—Appeal by defendants Robwill Corporation, Harold L. Snow, August R. Boggs, and Robert H. Miller from a single adverse judgment in six actions for balances alleged to be due for services rendered by plaintiffs in the development of tracts of real property for subdivision.

Two of the actions are by Joseph E. Bonadiman, sometimes called Bonadiman, a licensed civil engineer, for balances claimed to be due him for engineering services on two of the tracts involved. Four are by Bonadiman-McCain, Inc., referred to as the contractor, of which Mr. Bonadiman was president, for balances claimed to be due for grading, excavating, and other construction work on four of the tracts. The claims of both plaintiffs aggregated $36,081.12.

Defendants' answers admitted plaintiffs were authorized to perform, they undertook certain work on the tracts, and certain sums were paid them. They denied they were indebted to plaintiffs and denied the work was done as called for by any agreement with them. By way of cross-complaints, naming both plaintiffs as cross-defendants in each action, Robwill alleged damages resulting from the operations of plaintiffs in counts of negligence and breach of contract.

Plaintiffs' answers to the cross-complaints denied liability, and in the actions involving the final tract (16686) alleged: the contractor agreed to clear and grade the property "in accordance with the plan filed with and approved by the City of Los Angeles, being the first of such plans, to the extent that custom and usage in the grading industry in Los Angeles, California, permitted performance with the contours and other features shown thereon; and cross defendant Bonadiman-McCain, Inc., commenced to perform said clearing and grading work"; the owners ordered Bonadiman to revise the plan to provide 35 instead of 28 lots; the contractor undertook so to do but was unable to create more than 32 sites; Bonadiman

prepared a tentative 33-lot plan, advising the owners that it would be impossible to secure more sites and doubtful that as many as 33 could be obtained; the owners directed the contractor to proceed in an attempt to obtain 33 sites; as a result of increasing the number of sites the sizes of the individual lots were reduced.

The cases were consolidated for trial without a jury. It was stipulated that defendants be treated as a group and the cases be disposed of by a single set of findings and conclusions and by a single judgment.

The court found the reasonable value of the services to be $1,500 less than claimed by the contractor on one tract (20694) and $5,000 less than claimed by the contractor on the final tract (16686). It otherwise found the reasonable value of the services to be the amounts claimed by plaintiffs. It found that Robwill had not suffered any loss or damage by reason of any breach of contract or negligence of either plaintiff. The judgment awarded $27,906.62 to the contractor and $1,675.45 to Joseph E. Bonadiman, a total of $29,582.07. It denied interest and costs to plaintiffs.

Defendants were the owners of a steep ridge of undeveloped land lying north of Sunset and east of Sepulveda Boulevards in Los Angeles. About October 1955 Joseph E. Bonadiman and defendant Robert H. Miller discussed the development of the land for subdivision. Thereafter Joseph E. Bonadiman was employed to prepare plans for grading and streets and sewers, to make construction and field surveys, and to perform similar engineering functions in the development of the land into tracts suitable for subdivision. His compensation was based on an hourly charge.

On April 3, 1956, two written contracts were executed in respect to the construction work on three tracts.[1] Therein the contractor agreed to clear and grade the sites designated ''in accordance with the plans and specifications therefor.'' The contracts stated an estimated acreage in each tract and set a unit price of $400 an acre for clearing the land. They stated an estimated number of cubic yards of earth to be moved from different areas and set different unit prices a cubic yard for each area. The variance in the latter unit prices was based on the varying degree of difficulty in operating earth-moving equipment in the different areas. A paragraph in each of the

[1]These contracts were executed by individual defendants but in view of the stipulation that defendants are to be treated as a group, no question of individual liability on any contract is involved.

contracts provided that "final determination of quantities shall be made by the Engineer and mutually agreed upon by the Owner and Contractor upon completion of the work."

Joseph E. Bonadiman prepared a number of plans for each tract as the development of the three tracts proceeded. In order to distinguish the various plans involved in the creation of the subdivisions, Bonadiman testified to general usage of the following terms to describe particular plans. The first map prepared in the development of a tract is called the "tentative tract map." It shows the outline and number of lots in a tract and must be approved by the planning commission and city council of the city. After it is approved, a "grading plan" is prepared, showing the "pads" or building areas, location of drain benches, interception benches, and "things of that sort." It must be approved by the department of building and safety of the city before grading can start on a tract that is to be excavated. Thereafter "working drawings" are prepared as more accurate topographic data becomes available during the progress of the work. These are not filed with the authorities but are intermediate maps from which better quantity and cost estimates for the completed project can be determined. The only other official grading plan is the "as graded plan," which is a survey of the area showing elevations, pad areas, and locations of streets after all rough grading work has been completed. Thereafter an official "tract map" showing the dimensions of the lots, the lot numbers, and the area of the tract in the subdivision, is recorded with the county recorder.

Except for some "tentative tract" maps, Bonadiman prepared the named plans in the development of each tract. In each tract there was a variance in the building site areas between those shown on the "grading plan" and those shown on the "as graded plan."

About March 1956 Bonadiman, Miller, and Boggs discussed the development of Tract 16686, concerning which the main dispute arose. The development of this latter tract involved the creation of another small tract (23798) by the disposal of excess earth from Tract 16686. Bonadiman received from Miller an aerial contour map showing the topography of the area of Tract 16686 and a "tentative tract map" showing 22 lots. The latter was submitted and approved by the planning commission of the city of Los Angeles after Bonadiman had added the notation: "Prepared by Joseph E. Bonadiman, Civil Engineer." Bonadiman then prepared a "grading plan"

dated May 1956 which was approved by the department of building and safety of the city. This plan showed 28 lots. Defendants Miller and Boggs expressed approval of this plan, and excavation and grading was commenced thereunder. About August 15 Boggs advised Bonadiman that he wanted 35 lots. A number of preliminary sketches were prepared for a larger number of lots. The work continued, based on the sketches. A "revised grading plan" showing 33 lots was produced in October 1956. Miller and Boggs "agreed that it was a good plan and to go ahead with it."

Bonadiman testified: "Q. Did you at that time make any declaration to either of those gentlemen regarding the feasibility of the 33-lot plan? A. Yes. Q. What did you say in that regard and to whom? A. I said in that regard to Mr. Miller and Mr. Boggs both that to try to get 33 lots in a closed area such as this, with the immense fills that had to be constructed, was a very tight plan and that we might end up with 33 lots and we might end up with fewer lots. They agreed that that was a possibility. Q. Did you have any discussion before finally adopting the 33-lot plan as to the effect of that plan on the size of the pads? A. Yes. The 33-lot plan would cause smaller level pads to be constructed. Q. Well, did you say anything to that effect to Mr. Miller or Mr. Boggs? A. Yes. Q. And what was their reply, if any? A. Their reply was, especially from Mr. Boggs, that they wanted smaller pads; they could sell them quicker and they wanted the smaller pads. Q. Was anything said by any of the three of you men at the time the 33-lot plan was under discussion as to a particular size of pad for any particular lot? A. No. Q. Did you at any time agree to produce any particular size pad on any particular lot? . . . THE WITNESS: No."

The contractor used the "revised grading plan" and its counterparts for work sheets in the construction of the tract. Grading plans were revised from time to time, and the changes were discussed with Miller.

On November 7, 1956, the contractor submitted a proposed written contract for the construction work on Tract 16686; it was never signed. The provisions incorporated in the document were identical with the provisions of the executed contracts covering the earlier tracts except for a general description of the work, estimated quantities, and unit prices.

About February 1957 most of the fills had been made and it appeared there was no area in which to dispose of earth still to be excavated in leveling three lots. It was not

economically feasible to haul the dirt away. After a discussion with Bonadiman, Miller and Boggs agreed that the three lots should be left higher than shown on the working plan and should be reduced to two lots.

An "as graded plan" was prepared and sent to the Los Angeles engineer's office on March 28, 1957, and a "tract map" was subsequently prepared and delivered to the city engineer. The "as graded plan" was at variance with the "revised grading plan" (33-lot plan) in that it showed only 32 lots and differences in the sizes of six lots which resulted in a reduction in the total level building areas of those lots.

Defendants made payments aggregating $274,230.28 in accordance with invoices rendered as the work had progressed. Payment for one tract (19324) had been made in full. Defendants refused to make payment of the balances for which these actions were brought. The contractor ceased work on May 17, 1957, claiming that all work undertaken by agreement had been completed.

The record shows contradiction by defendants of many of the facts as stated, but this court is required to view the evidence in the light most favorable to plaintiffs.

The findings in respect to Tract 16686 are: 1. Joseph E. Bonadiman caused to be filed a grading plan of the tract with the city of Los Angeles. 2. Bonadiman-McCain, Inc., agreed with Robwill that Bonadiman-McCain would clear and grade tentative Tract 16686 in accordance with plans prepared by Joseph E. Bonadiman and cause same to conform with contours shown thereon. 3. The original plan and subsequent plans therefor were so prepared that the maximum of level area reasonably available for building sites would be provided. 4. The original plans for the tract were modified and new plans prepared to conform to good engineering practices and to take into account the condition of soil and terrain found on the premises, and to attempt to afford a greater number of lots in the subdivision. 5. Joseph E. Bonadiman, in making the plans, and Bonadiman-McCain, Inc., in carrying them out, conformed to the original plan and created the maximum amount of level area reasonably available for building sites in the number requested by Robwill to the extent possible, having in mind good engineering practices, the condition of soil and terrain, and reasonable costs. 6. All the level area available for building sites as shown on the plans, if produced, would have been of pecuniary value to the defendants, but none thereof was lost as a result of any breach of contract or negligence by the plaintiffs, or

either of them. 7. Robwill has not suffered any loss or damage whatsoever by reason of any breach of contract or negligence by either plaintiff or cross-defendant.

The appeal is taken from all parts of the judgment. Inasmuch as arguments in the briefs appear limited to that part of the judgment dealing with the final tract (16686), the appeal from other parts may be deemed abandoned. (*Edwards* v. *California Sweet Potato Corp.*, 104 Cal.App. 715, 717-718 [286 P. 733]; *Estate of Hinde*, 200 Cal. 710, 715-716 [254 P. 561].)

The sole contention is that the trial court erred in awarding compensation to plaintiffs based on the amount of earth moved and other services performed, the amount to which they would have been entitled had they made full performance, when in fact there was only substantial performance.

Defendants assert plaintiffs contracted to produce level building areas of the specific dimensions, elevation, and contours shown on plans prepared by Joseph E. Bonadiman; the land was not excavated and graded according to the plans; and substantial loss of building area resulted in: (1) gross reduction in the depth of lots in the northwest portion of the tract, and (2) failure to produce the most northeasterly lot. Plaintiffs contend: they did not undertake to produce a specific amount of level area, they produced the maximum level area available under the circumstances and are entitled to full compensation at the unit rate for earth moved and services performed, and any substantial pecuniary loss of defendants is more than equalized by the trial court's reduction of $6,500 from the amount claimed for those services and the disallowance of interest and costs.

While the full import of the findings is not entirely clear, it does appear therefrom and from the evidence that the trial court determined the contract did not, and was not intended to, guarantee strict performance to the particular details of any of the plans and specifications, but that plaintiffs' duties thereunder were limited to following the original and subsequent plans to the extent of making a good faith attempt to obtain the number of lots in the locations, contours, and sizes shown thereon, taking into account good engineering practices, the condition of soil and terrain, and reasonable cost. Under this view of the contract the court found full performance.

In support of their contention that the contract contemplated a result including 33 level building sites of specific

dimensions and not the mere rendition of services, defendants point to the pretrial conference stipulation of agreed facts which stated in part:

"4. Plaintiffs contend that Mr. Bonadiman, as an individual was employed to render engineering services in designing grading plans and street plans, sewer plans, construction and field services and storm drain design upon certain of the properties involved. Defendants contend that Mr. Bonadiman was so employed and acted in these respects as agent of the corporate plaintiff within the scope of his agency.

"5. The agreement between plaintiff corporation and defendants was that plaintiff corporation would grade the property, including excavation and filling, *in accordance with the plan prepared by Joseph E. Bonadiman* as alleged in the foregoing paragraph. . . ." (Emphasis added.)

The stipulation does not identify the particular plan to be followed by the contractor and, of course, an examination of the plan is necessary to ascertain the complete agreement between the parties. (*Hancock* v. *Clark*, 56 Cal.App. 277, 279 [204 P. 1098]; *Miller* v. *Brown*, 136 Cal.App.2d 763, 776 [289 P.2d 572].) Nor does the unsigned written contract in respect to Tract 16686 identify the "plans and specifications" to which it refers, even assuming that it reflects other terms of the oral contract between the parties as suggested by defendants and by a pretrial stipulation which stated: "The work undertaken by the plaintiff corporation was basically defined by one signed contract, and by other submitted but unsigned contracts, identification of which the parties are agreed upon. Some of the work, however, was undertaken orally and not within the scope of the foregoing writings." Inasmuch as the construction work had been in progress some three months at the time the document was submitted to defendants and in view of defendants' failure to sign and return it to the contractor, contradictory inferences may be drawn as to whether it did or did not incorporate the *exact* terms of the earlier oral contract between the parties.

To establish the oral contract and modification alleged under the pleadings and explain the incomplete reference of the pretrial stipulation to the "plan," evidence was received regarding the subject matter and object of the contract, the preliminary dealings of the parties, the terms of their prior contracts for the development of the earlier tracts, the course of their conduct in respect to the work under all of the contracts before any disagreement arose, the manifestations of assent to particular details of the proposed work

under the original contract and under the modification, and the general usage of maps and plans in the development of a subdivision. The evidence reveals circumstances which are not comparable in respect to the subject matter of the contract and the relationship of the parties with the usual circumstances surrounding an ordinary building contract whereby the builder undertakes to produce a completed structure in conformity with prior approved plans and specifications, as in the cases of substantial performance cited by Robwill.

Unlike the ordinary building contract which calls for the erection of a structure, the subdivision development was a "closed" project in that it required the excavation of a quantity of earth which would make the fills to produce maximum level building sites. The excavation of too small a quantity of earth would leave unfilled areas; the excavation of too large a quantity of earth would leave an undesirable knoll since it was not economical to haul it away. Obviously such a project does not contemplate the precise results to be expected in the erection of a structure. Also unlike the usual inclusive and set prices of erecting a building, the compensation of the contractor in the present case was based on the quantity of earth moved and on the number of acres cleared; and the compensation of the engineer was based on an hourly rate. Unlike the usual practice of providing supervision and inspection by an architect or the owner in the course of construction of a building, defendants apparently provided no regular inspection to insure that the work conformed to any plan since it contends Bonadiman supervised the construction activities in the scope of his duties for the contractor and not as their agent. Defendants apparently were aware that Bonadiman prepared numerous plans and revisions of them as the work progressed on the various tracts since it paid for such engineering services.

In view of the subject matter of the contract and the conduct of the parties in respect thereto prior to any disagreement, the testimony that the contract called for approximations rather than precise results in the number, sizes, locations, and contours of the lots is not unreasonable. By its finding that no damage resulted to Robwill as a result of a breach of contract by plaintiffs, it is apparent the court relied on this testimony in ascertaining the terms of the contract.

When parol evidence is properly admissible and such evidence is conflicting, the question of interpretation of a

contract is one of fact and not of law. (*Schmidt* v. *Macco Construction Co.*, 119 Cal.App.2d 717, 734 [260 P.2d 230].) Schmidt involved an excavating and grading contract which, although in writing, was uncertain. The written contract called for ''final grade to a useful contour for residential sites'' and stated that a map showing approximate final contours would be furnished within 45 days. Various maps were submitted to the contractor but he contended they required far greater excavation work than contemplated under the contract. It was held that evidence relating to preliminary negotiations of the parties was, in the absence of. the particular map, pertinent and relevant as to what. the parties meant by the clause in the contract, and that if such evidence was conflicting, the question of construction was one of fact and not of law.

██ In the present case the question of construction was one of fact. It cannot be held, as a matter of law, solely on the basis of the incomplete stipulation at the pretrial conference which failed to identify the ''plan'' to which reference was made, that plaintiffs guaranteed a specific result. The construction of the oral contract by the trial court is neither unreasonable nor inconsistent with the evidence. This court cannot, where it is a question of fact, reach a different although equally reasonable construction. ██ When the construction of an oral contract with the aid of testimony is not unreasonable or inconsistent with the evidence, the conclusion of the trial court will not be disturbed. (*Williams* v. *Denver*, 167 Cal.App.2d 101, 104 [334 P.2d 161].)

██ Defendants contend that even if it is conceded the court construed the contract as one for services, plaintiffs nevertheless breached the contract when they created the building sites in the northwesterly area of Tract 16686 at variance from both the 28-lot and the 33-lot plans. It is asserted that both plans showed identical outlines of the lots to be produced in that area of the tract and that the contractor had no sufficient reason to make changes, but by arbitrarily increasing the width of ''benches'' on the slope of a fill, part of the level building areas was lost. Plaintiffs deny that the plans were identical, calling attention to certain differences, but admit the results vary from the plans. The record indicates the parties used different drawings of the 33-lot project in making their comparisons. Plaintiffs insist in any case that the outlines shown on the plans were tentative and mere approximations.

The northwesterly building pads were at the top of a fill

and bounded on the west by the lip of the fill. On the slope of the fill were five terraces, or slope interruptions. City regulations and good engineering practice required that fill slopes be interrupted at intervals by these insloping areas for drainage purposes. There is much confusion in the record arising from the terminology used in describing the slope interruptions. The shelf-like outer area is called a "bench," and as the additional fill immediately above is started a "gutter" is created. The line at the lowest portion is the flow line of the gutter which is paved. Both the 28-lot and the 33-lot plans show parallel double lines indicating five interruptions each approximately 10 feet in width. The 28-lot plan designates the distance between the two lines as "10′ bench"; the 33-lot plan designates it as "drain bench." Neither plan shows "gutters." When the work was completed, the total distance from the edge or lip of the benches to the face of the fill above was approximately 13 feet. Defendants contend this resulted from a violation of the contractor's duty to perform in accordance with the plans, since each plan showed only a 10-foot slope interruption; and that as a result the lots at the top of the fill were reduced in size.

Bonadiman testified that the change from the 28-lot to the 33-lot plan had no effect on the width of the bench areas as graded. He explained that as the higher fills were constructed, the gutters were created. He apparently considered the resulting 13-foot distance including bench and gutter a result of following the plans. He testified: "When the fill was started in the bottom of the canyon, we were compelled by the City to make the fill slopes on approximately one and a half to one. We were compelled by the City to make benches with a two-foot slope back to the future line. So there was no way that we could, at any time after we started to fill that slope and at least got to the first bench, to change the plan. The plan had been established and we had to maintain that. So we couldn't have started at the same place to come up with a steeper fill. The City would not let us do that."

Inasmuch as the negotiations in respect to the final tract were subsequent to the start of the fill, Bonadiman's interpretation of the plans may have appeared reasonable to the trial court. In any event, the evidence supports the finding that the contractor created the maximum amount of level area reasonably available for building sites. In comparing performance with the undertaking found by the court, there was no breach.

The cases cited by defendants for the proposition that a

contractor has no implied authority to alter the plans are not applicable to the factual situation. Here the prior pattern of the parties' conduct apparently convinced the court that it was their intention that Bonadiman prepare and revise plans within certain limits as the work progressed, and that the undertaking included performing the work in accordance with the altered plans.

Defendants also assert that, although Bonadiman may have advised that the 33-lot plan was a "tight" plan, the loss of the lot in the northeast portion of the tract was a result of his miscalculation in estimating the amount of earth involved in balancing the cut and fill and not because the area was not sufficient. Defendants argue that no distinction can be made between the miscalculation of soil texture as to its sufficiency to sustain a structure and as to its shrinkage characteristics in other respects, citing the rule that if a builder wishes to protect himself against the hazards of the soil he must do so by his contract.

There was expert testimony that the custom and usage in the area was to rely on the experience of the engineer in estimating the shrinkage factor rather than on soil tests because it was difficult to secure enough data by soil tests to determine an accurate shrinkage factor. Bonadiman testified he expected the earth to shrink when, in fact, it expanded. Any error is therefore attributable to the engineering rather than to any failure of the contractor to follow the plans.

The engineer's undertaking in respect to the plans he prepares is comparable to that of an architect, which in the absence of a special agreement is not an absolute guaranty that satisfactory results will ensue. (*Cf. Palmer* v. *Brown*, 127 Cal.App.2d 44, 61 [273 P.2d 306].) As stated in *Gagne* v. *Bertran*, 43 Cal.2d 481, 489 [275 P.2d 15]: "The services of experts are sought because of their special skill. They have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence. Those who hire such persons are not justified in expecting infallibility, but can expect only reasonable care and competence. They purchase service, not insurance."

By his contract to furnish services, Bonadiman implied that he possessed the competence and ability ordinarily possessed by members of his profession. In testing his competence, consideration is to be given to the knowledge employed by members of his profession at the time he was employed. No

evidence is called to our attention showing that Bonadiman's estimate of the shrinkage factor was so inaccurate as to indicate that he did not have and employ at the time that degree of knowledge employed by other members of his profession. It further appears reasonable to infer that his reference to the 33-lot plan as a "tight" plan indicated to defendants that he did not promise the perfect balancing of the cut and fill operations. Whether he failed to exercise reasonable care and diligence in performing the services he rendered and whether the contractor did so in performing the work were questions of fact which the court determined adversely to defendants, and those findings are fully supported by the evidence.

Basically all of the problems on this appeal are factual. The evidence concerning the making of the contract and its terms and concerning the identification of the plan referred to in the pretrial conference stipulation is highly conflicting; even the evidence concerning the proper interpretation of the various plans is in conflict. Because of the general statement that the work was to be done "in accordance with the plan prepared by Joseph E. Bonadiman," defendants would have us construe the contract in conformity with their view of the evidence. This we cannot do. The contract must be considered as a whole and we are bound to resolve all conflicts in the evidence in support of the judgment. The court's implied conclusion that the parties recognized the plans as delineating the optimum result which could be anticipated, but contemplated that changes therefrom within reasonable limits would be made in the course of the earth-moving operations, is based on its view of the conflicting evidence. We cannot disturb it.

Affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied August 16, 1960, and appellants' petition for a hearing by the Supreme Court was denied September 14, 1960. Traynor, J., was of the opinion that the petition should be granted.