**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Ervin W. STONE, Defendant-Appellant.**

**No. 71–1580.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1972.

Decided Nov. 29, 1972.

Rehearing En Banc Denied Jan. 3, 1973.

Certiorari Denied April 16, 1973.
See 93 S.Ct. 1898.

Michael J. Costello, Springfield, Ill., for defendant-appellant.

Donald Bruce Mackay, J. William Roberts and Max E. Goodwin, Springfield, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The defendant was convicted by a jury of the robbery of the State Bank of Latham, Illinois.[1] Numerous alleged errors are raised in this appeal, each of which is considered below. We affirm the judgment of conviction.

The bank robbery occurred at approximately 3:00 P.M. on March 11, 1970. Witnesses to the robbery testified that the robber wore a gray cloth mask, gloves and a hat, and carried a gun having a barrel approximately six inches long. The robber was identified as being a man with a fair complexion, dark reddish hair and over six feet tall. The defendant was arrested and charged with the crime eleven months later.

At the trial, the four bank employees who had witnessed the crime testified as to the events of the day in question. None of them was able to make an unequivocal positive identification of the defendant, but two employees thought the defendant was the man who had robbed the bank.

The principal evidence indicating that Stone was the bank robber came from the testimony of two acquaintances of his and from testimony which showed that he was suddenly in possession of large sums of money. Linda Hudspeth, who had known Stone since September, 1969, testified that the defendant told her he was planning to rob the Latham bank and asked her to purchase a gray scarf for him, which she did in February, 1970. She also testified that Stone called her late in the afternoon of March 11, 1970, and told her he had just robbed the bank. The following day Stone re-portedly gave her three hundred dollars and told her that he had buried the gun and clothing used in the robbery. Somewhat later an altercation apparently developed between the witness and the defendant. Mrs. Hudspeth stated that she threatened to report the crime and that Stone told her if she did he would kill her. Stone showed her a small pistol which he carried.

A second acquaintance of the defendant, Andrew Skelton, testified that he had gone to school with Stone and been a friend of his for twelve years. According to his testimony, Stone called him on February 13, 1970, and told him he was going to rob a small bank because he needed money for support payments. Skelton testified that he next saw Stone on May 5, 1970, when the defendant drove Skelton to a bank in Greenview, Illinois, where he had previously rented a safe deposit box, and showed the witness a green tackle box containing white envelopes filled with money. The witness stated that he told Stone he did not wish to become involved but that Stone threatened him with a .22 caliber pistol. Subsequently, Skelton traveled with Stone to various cities in Iowa and Illinois where the defendant converted the allegedly stolen money into cashier's checks. Testimony from other persons substantiated much of Skelton's testimony. A green tackle box taken from the defendant's home when he was arrested was identified by Skelton as the box containing the money.

The government produced numerous witnesses who testified to substantial deposits made to the defendant's bank account during May of 1970, to expenditures of $4,250 for a truck and $725 for a boat in May, 1970, and to the fact that Stone's name appeared on money orders and drafts purchased at various banks. Thus, even without the positive identification of the defendant by the bank employees, the evidence was substantial that Stone was the bank robber.

---

1. The indictment charged defendant with violating 18 U.S.C. § 2113 (a), (b) and (d).

### I.

Stone's first complaint relates to the introduction of a .22 caliber pistol into evidence which was apparently unconnected with the robbery of the Latham State Bank. The revolver was taken from underneath the mattress in the defendant's home at the time of his arrest. Although a gun was used by the bank robber, testimony indicated that it was unlikely that the gun introduced at trial could have been the firearm used in the robbery.[2] Government counsel, in his closing argument, conceded as much, stating: "Now, I'm not suggesting, ladies and gentlemen, that this was the gun in which the bank robbery was completed. In fact the barrel isn't long enough . . . ." In the remainder of his argument, the prosecutor indicated that the purpose for which the gun had been introduced was to corroborate the testimony of Mrs. Hudspeth and Skelton as well as to promote an image of the defendant as a dangerous and generally disreputable person.[3]

Stone argues that the introduction of this gun for these purposes was improper and prejudicial to his case. In Moore v. Illinois, 408 U.S. 786, 798–800, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the Supreme Court held that the introduction of a 16-gauge shotgun into evidence in a murder trial in which the victim had been killed by a 12-gauge shotgun was permissible under the due process clause. The prosecutor in that case stated that his purpose in introducing the weapon was to show that the defendant and his companion were "the type of people that use shotguns." Under this ruling, there can be no question but that the introduction of the gun in this case did not violate the defendant's right to a fair trial under the due process clause of the Fourteenth Amendment.

Defendant nevertheless argues that under federal evidentiary standards, the introduction of the gun was an abuse of discretion on the part of the trial judge. The trial judge has wide discretion in the admission or exclusion of collateral evidence. There can be no doubt that the gun had probative value in substantiating the statements of Mrs. Hudspeth and Skelton. Defendant argues that evidence of threats against these witnesses was inadmissible, and that even if admissible, there was no showing that the gun introduced into evidence was the weapon with which they were threatened. These arguments ignore the circumstances present in this case. Mrs. Hudspeth and Skelton were both subjected to rigorous cross-examination designed to discredit their testimony and to show that Mrs. Hudspeth was a disappointed girl friend who in fact threatened to kill the defendant. Both witnesses were cross-examined as to why they had waited so long to tell authorities their stories. Stone did not object at the trial to testimony as to threats. Once the threats were in evidence, and the credibility of the witnesses was attacked, the .22 caliber pistol became highly relevant as tending to prove that the defendant could in fact have carried out the alleged threats.[4] We

---

2. The bank employees testified that the gun used in the robbery had a long barrel.

3. The prosecutor stated:
"I'm asking you to look at the threats of violence made to these people in the bank. I'm asking you to look at what Linda told us. You don't tell anybody, or you'll get a bullet in the head. I'm asking you to look at what Joe Skelton told us, don't you do anything or I'll kill you. I'll shoot you with this gun. If I don't get you, somebody else will, and then I finally ask you to consider, here's a man sleeping in his bed in his home with young children running around the house, his wife and young children running around the house, sleeping in bed at approximately twelve noon, on a weekday, with a fully loaded revolver right under the mattress where he's sleeping." (R. 493–94)

4. The Revised Draft of the Proposed Rules of Evidence for the United States Courts and Magistrates, Rule 401 (March 1971), defines relevant evidence as "evidence

cannot say that any possible prejudicial effect outweighed the probative value of the pistol under these circumstances.

## II.

■ Defendant also alleges error in admission into evidence of the fruits of a search of his home made pursuant to his wife's consent shortly after Stone's arrest. Stone insists, first, that his wife could not legally give consent to such a search unless an "agency" relationship is established; and second, that even if a spouse's consent were otherwise sufficient, the consent in this case was the product of coercion. The first part of this argument is without merit. In United States v. Sferas, 210 F.2d 69, 74 (7th Cir.), cert. denied, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954), this court held that "where two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either." This holding is applicable here and the wife's consent, unless given under coercion, is binding upon her husband. *See also* United States v. Johnson, 413 F.2d 1396, 1400 (5th Cir. 1969); Roberts v. United States, 332 F.2d 892, 896–897 (8th Cir.), cert. denied, 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1964).

■ The question of whether a consent is given voluntarily and without coercion is one of fact. Stone argues that two factors allegedly present in the instant case preclude a finding that the consent was freely given. Mrs. Stone executed the consent form giving F.B.I. agents authority to search the house approximately eight minutes after defendant's arrest. There was some testimony that she was upset at the time but the record does not indicate that she was any more disturbed than any other person would be likely to be at the sudden intrusion of police officials under these circumstances. To hold that the mere con-

dition of being "upset" by the presence at one's home of F.B.I. agents is enough to make any consent the product of coercion might effectively foreclose almost all searches conducted pursuant to a voluntary consent. We decline to so hold.

■ The defendant also argues that the F.B.I. agents told Mrs. Stone that if she did not consent they could obtain a search warrant. The testimony on this point is conflicting. Mrs. Stone testified that she was positive that the F.B.I. agents said they could get a search warrant. The F.B.I. agent in charge of the Stone case testified that to his knowledge no one stated that the F.B.I. could obtain a warrant. He further testified that it would have been highly unlikely that anyone would so state since the F.B.I. had previously been advised that there was insufficient probable cause for authorization of a warrant. The trial judge heard the testimony of these witnesses and observed their demeanor on the witness stand and believed the testimony of F.B.I. agent Joseph Giglio. There is no basis for overturning this conclusion. Mrs. Stone testified that no threats were made to her by the F.B.I. agents and that she read and signed the consent form voluntarily. We conclude that there was no error in the ruling of the district court.

## III.

■ The defendant argues that the government failed to disclose evidence favorable to the accused prior to trial. This argument is premised on the fact that the government had knowledge, prior to trial, that two of the bank employees could not identify the defendant. Stone insists that failure to inform the defendant of this evidence before trial violated his due process rights under the holding of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, in *Brady*, the defendant never had the benefit of the exculpa-

---

having any tendency to make the exist-ence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence." 51 F.R.D. 315, 342.

tory statement. The government in this case produced the two witnesses at trial and they testified that they could not identify the defendant. Stone has failed to show that any prejudice resulted from a failure to make the testimony available to him at an earlier time.

## IV.

Additional errors are alleged relating to a jury instruction as to reasonable doubt; separate instructions as to each count of the indictment; failure to give an instruction on the weight and credibility to be given the testimony of Skelton and Mrs. Hudspeth; failure to grant a mistrial when a witness wept on the stand; failure to declare a mistrial because the prosecutor referred to a juror by name; and failure to grant a mistrial because of adverse newspaper publicity. Defendant also attacks the sufficiency of the evidence to sustain the guilty verdict. We have examined these contentions and find them to be without merit. The judgment is affirmed.

Affirmed.

SWYGERT, Chief Judge (dissenting).

I would reverse the conviction of the defendant on the single ground that the Federal Bureau of Investigation conducted an illegal search of the defendant's home and that the evidence obtained by that search should have been suppressed.

The evidence showed that on the day of the defendant's arrest seven or eight special agents of the F.B.I. arrived at his home shortly before noon. The defendant was sleeping at the time, and his wife admitted the agents. After being awakened from sleep, the defendant dressed. He was then handcuffed and placed in an automobile. Several minutes after her husband was taken from the house, the agents presented Mrs. Stone with a written consent to search the premises of the home, which consent she signed. The agents thereupon searched the house and seized a tackle box containing duplicate copies of the money orders obtained by the defendant. The tackle box and its contents were admitted into evidence over the objection of the defendant.

Mrs. Stone testified that the agents told her that she could sign the consent to search or that they could get a search warrant. This was denied by the F.B.I. agent in charge of the case. Mrs. Stone also testified that she was quite upset at the time. The testimony of two agents is contradictory on this point: one said Mrs. Stone appeared calm when she signed the consent; another said that she appeared to be upset. The defendant testified that he never gave the F.B.I. agents permission to search nor did he give his wife permission to consent to the search.

A significant aspect of the question presented in this case is the fact that the F.B.I. agent in charge testified that he had conversed with the Assistant United States Attorney handling the case—presumably before the search—and had been advised that there was insufficient probable cause for the authorization of a search warrant.

## I

It is axiomatic that the Constitution endows every citizen with an individual right to the preservation of his privacy against official intrusion. The "Fourth Amendment protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The right of privacy which the Constitution protects is not strictly coextensive with spatial expanses over which a person has some superior interest recognized by the law of property. As the Supreme Court said in Warden v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967), "[w]e have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts." Thus the defendant in Katz was protected from governmental intrusion by phone tap into a public telephone

booth.  Similarly, the privacy of a transitory hotel resident was protected in Stoner v. California, 376 U.S. 483, 84 S. Ct. 889, 11 L.Ed.2d 856 (1964), where the Court held:

> It is important to bear in mind that it was petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's.  It was a right, therefore, which only petitioner could waive by word or deed, either directly or through an agent.  376 U. S. at 489, 84 S.Ct. at 893.

In sum, the central policy of the fourth amendment is to protect from official search areas "where, like a home . . . a person has a constitutionally protected reasonable expectation of privacy."  Katz v. United States, 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring).

A reasonable individual expectation of privacy may be officially invaded only under special circumstances.  Foremost of course is when a search warrant is issued by a magistrate.  Recently the Supreme Court said: "The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police."  Chimel v. California, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969).  The Court went on to say:

> And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.  We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative. 395 U.S. at 760, 89 S.Ct. at 2039 (1968), quoting McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

Thus the warrant requirement is removed when the search may be justified by an emergency or "exigent" circumstance.  For example, a warrantless search of a stopped automobile was authorized in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), in response to the reality that a vehicle may move on and disappear before a warrant can be obtained.  Similarly, Chimel allowed a warrantless search incident to an arrest whenever the arresting officer reasonably fears attack by the arrestee with a weapon concealed on his person, or fears that the arrestee will be able to dispose of easily destructible or concealable evidence before a warrant may be obtained.

Another exception to the warrant requirement is a search which follows the voluntary consent of the person whose privacy is sought to be invaded.  As indicated by the Supreme Court in Stoner, the essence of this exception is a waiver of the constitutional right to privacy, and not a subordination of personal expectations of privacy to paramount policies of law enforcement.  The same cannot be said of search by consent of third parties.  This exception rests, I submit, on a different footing—more akin to that which justifies a warrantless search in exigent circumstances than to the waiver theory underlying a pure consent search.

## II

Only where a true agency may be shown, in the strictest legal sense of that term, may a third party consent to a waiver of another's rights under the fourth amendment.  Stoner v. California, 376 U.S. at 489, 84 S.Ct. 889.  This is a corollary of the long settled rule that constitutional rights may be waived by their holder and none other.  With respect to agency in the husband-wife setting, it is an established principle that the marital relationship entrusts the wife with neither actual nor apparent authority to bind her husband in commercial transactions.  Restatement (Second) of Agency § 22 (1957).  A fortiori, this view applies to so personal a matter as the waiver of constitutional rights.  In United States v. Airdo, 380 F.2d 103 (7th Cir. 1967) this Circuit re-

jected the agency rationale in the context of marital relationships while restating the rule regulating consent by a wife to a search of the dwelling occupied by her and her husband:

> [W]e acknowledge the rule that "where two persons have equal rights to the use or occupation of premises, either may give consent to a search, and the evidence thus disclosed can be used against either." . . . The considerations most applicable to the third person's consent in such cases are not related to principles of agency connecting the defendant with the person acquiescing in the search, but rather concern the *reasonableness, under all the circumstances,* of a search consented to by a person having immediate control and authority over the premises or property searched. United States v. Airdo, 380 F.2d 103, 106–107 (7th Cir. 1967), cert. denied, 389 U.S. 913, 88 S.Ct. 238, 19 L.Ed.2d 260 (1967) (emphasis added).

This view is in accord with the holdings of a number of other circuits. United States ex rel. Cabey v. Mazurkiewicz, 431 F.2d 839 (3d Cir. 1970); United States v. Thompson, 421 F.2d 373 (5th Cir. 1970); United States v. Mackiewicz, 401 F.2d 219 (2nd Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968); Pasterchik v. United States, 400 F.2d 696 (9th Cir. 1968), cert. denied, 395 U.S. 982, 89 S.Ct. 2142, 23 L.Ed.2d 770 (1969); Anderson v. United States, 399 F.2d 753 (10th Cir. 1968); United States v. Alloway, 397 F.2d 105 (6th Cir. 1968); Roberts v. United States, 332 F.2d 892 (8th Cir. 1964), cert. denied, 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965).

The touchstone of the rationale underlying the rule enunciated in *Airdo* is "the reasonableness, under all the circumstances" of the third person consent, the voluntariness of that consent aside. Some courts have justified a search by third party consent by reasoning that a party who lives with another or shares an interest in property with another "takes the risk" that the other will consent to a police search of the shared dwelling or property. *See, e. g.,* Marshall v. United States, 352 F.2d 1013 (9th Cir. 1965); State v. McCarthy, 20 Ohio App.2d 275, 253 N.E.2d 789 (1969),* in other words, that a person holding only part interest in the use of premises cannot reasonably expect that his dealings within those premises be free from official prying. What is being said, essentially, is that a spouse or cotenant lacks a personal interest cognizable under the fourth amendment. With this view, I strongly disagree. The constitutional right of privacy is individual to each person and may not be compromised so as to permit police intrusion by the mere sharing with another of the situs or property from which that right emanates in concrete form.

A fatal flaw in the "risk" theory is shown by cases holding that where one tenant gives permission to search an apartment, evidence obtained in that search is inadmissible against a cotenant

---

* Some courts have offered what may be another explanation of the joint possession rule. See, for example, Roberts v. United States, 332 F.2d 892 (8th Cir. 1964), where the Eighth Circuit stated: [T]he right of the wife . . . to enter the home which was in her possession and control cannot be seriously questioned and . . . *her invitation to and authorization to the officers to enter and search was an outgrowth thereof.* It is not a question of agency, for a wife should not be held to have authority to waive her husband's constitutional rights. This is a question of the wife's own rights to . authorize entry into premises where she lives and of which she had control. 332 F.2d at 896 (emphasis added).

This analysis is apparently distinct from "risk" theory, and assumes that an absent party whose dwelling is searched is the holder of unwaived fourth amendment rights to privacy. Unfortunately, the position fails to explain why these rights of the absent party become irrelevant upon the consent of a wife or cotenant, or how the right of entry of the wife has as its natural "outgrowth" the right to authorize a police search against her husband.

having equal rights in the premises if the latter was present at the time of search and objected thereto. Lucero v. Donovan, 354 F.2d 16 (9th Cir. 1968); *see* Dorsey v. State, 2 Md.App. 40, 232 A.2d 900 (1967); Tompkins v. Superior Court, 59 Cal.2d 65, 27 Cal.Rptr. 889, 378 P.2d 113 (1963); Carlton v. United States, 391 F.2d 684, 686 n. 4 (8th Cir. 1968); *contra*, People v. Smith, 183 Cal.App.2d 67, 6 Cal.Rptr. 866 (Dist.Ct. App.1960). This question is pertinent: If it is true that the objector has accepted the "risk" of a consent search and no longer expects privacy of his affairs in the dwelling, why does his presence have an impact on the legality of the search? The question, I submit, cannot be answered. Nevertheless, I do agree that the absence of a party whose property is sought to be searched is an important consideration relevant to the reasonableness of a search by third party consent.

### III

In my judgment, search by third party consent rests on the same policy of government need which supports an exception to the warrant requirement in exigent circumstances. When time or a lack of probable cause does not permit a warrant to be obtained, a search by consent is often the only way in which a dwelling may legally be searched. Thus, the precise issue of third party consent should be this: Are the police to be deprived of the benefits of a consent search of a shared premises when the only party who could effectively waive his fourth amendment rights to privacy, and who might do so if asked, is absent from those premises? I suggest that the answer lies in the reasonableness of this kind of search, considering all the attendant circumstances. The exigencies of the situation, the relationship of the parties, the whereabouts of the absent party, and the reasons for his absence are all relevant factors.

Not all third parties may effectively consent, of course. Where the third party has interests indifferent or adverse to those of the absent person, consent will not lie. For example, the hotel clerk, as in *Stoner*, is indifferent to the privacy interest of the room renter. The estranged wife is adverse to her husband's fourth amendment rights. *Cf.* Kelly v. State, 184 Tenn. 143, 197 S. W.2d 545 (1946). Conversely, the common interests and intimate character of the relationship of the parties may lend support for the third party consent search. See United States ex rel. Cabey v. Mazurkiewicz, 431 F.2d 839, 843 (3d Cir. 1970).

Basic to the third party consent rationale is the premise that the absent party might, were he present, consent to the search, in which event no constitutional rights would be violated. Therefore the whereabouts of the absent party is highly important, as is the cause of his absence. *See* 39 U.Cin.L.Rev. 807, 814 (1970); 79 Harv.L.Rev. 1513, 1519 (1966). When the person who could waive his right to privacy is absent from his dwelling by reason of flight or hiding from law enforcement officers for fear of arrest, as in Wade v. Warden, Maryland Penitentiary, 278 F.Supp. 904 (D.Md.1968), a strong case for third party consent to search is presented. The suspect has consciously made himself unavailable to the police, and it is entirely his fault that they cannot obtain his answer to their request to search. If, on the other hand, his absence is not in response to a fear of arrest, but simply the result of an errand or other everyday activity, the case becomes less clear.

In the present case, the defendant was not "absent" in any sense in which that term should be used in the context of a third party consent search. He was in official custody at the scene of the search only minutes prior to the consent of his wife and, after that, was in custody in transit to and at the police station. Without the slightest difficulty, the arresting officers could have requested his consent to search. They did not, perhaps in fear of a negative reply, and it is now contended that his wife's consent was valid on the basis of a rule which

rests, as I see it, on the actual impossibility of presenting the suspect with a request to search. I reject this contention, and suggest that the rule of *Airdo*, however sensible in other settings, was wrongly applied to the facts of this case.